UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------- :
: 
UNITED STATES OF AMERICA : No. 3:02CR176 (SRU)
:
v. :
:
RONNIE JAMES : September 27, 2005
:
---------------------------------------------- :

**DEFENDANT RONNIE JAMES' BRIEF ADDRESSING CROSBY REMAND**

**INTRODUCTION**

The United States Court of Appeals for the Second Circuit has returned this case to this honorable court for further proceedings in contemplation of <u>USA v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Second Circuit's response to the United States Supreme Court's landmark holding in <u>USA v. Booker</u>, 125 S.Ct. 738 (2004), commonly referred to as a <u>Crosby</u> Remand.

Defendant James' Federal Sentencing guideline range fell below the mandatory minimum 120 months provided for by 21 U.S.C. §841(b)(1)(B).  He was sentenced, however, to 120 months, the court's having rejected, by judicial fact finding, his request for a departure (more fully and particularly set forth in the in-camera proceedings conducted by the court at the time of the original sentencing[1]).

---

[1] Defendant James understands that, as part of its analysis, this court will review all materials impacting upon Defendant James' sentence, including all of the filings and proceedings which were conducted in-camera.  The facts supporting and/or relating to the departure and other sentencing considerations addressed herein will be set forth only in the specificity sufficient to inform the court for the bases for the requests.  The court is, respectfully, directed to all of said in-camera filings and proceedings, upon which defendant James relies in this <u>Crosby</u> remand.

Defendant James respectfully requests that this court permit him to withdraw his plea of guilty and to proceed to trial by jury to decide his guilt and, if found guilty, his entitlement to the requested departure (see in camera proceeding). Alternatively (i.e., should the court reject the arguments supporting that request) he requests that the court sentence him within the guidelines range provided by an Adjusted Offense level of 23, or to a commensurate non-guidelines sentence, notwithstanding the mandatory minimum set forth in 21 U.S.C. §841(b)(1)(B), and that the court permit the defendant to explore all other avenues of departure which may be available if the court adopts the constitutional challenge set forth below.

Defendant James acknowledges that one or more of the requests made at this time have not yet been resolved by the Second Circuit or by the United States Supreme Court. In particular, at footnote 8, the Crosby Court squarely identifies one of the claims made herein as an issue both created and left unresolved by Booker and Crosby.

**SUMMARY OF RELEVANT FACTS**

In or about September, 2002, Defendant James was approached by FBI agents and questioned about their belief that he was involved in the criminal activities of Quinne Powell and his associates. Appellant denied that involvement. On December 27, 2001, an indictment was handed up in USA v. Quinne Powell et al., Docket No. 3:99CR264(AHN). It charged Mr. Powell and others in some 32 counts including murder, attempted murder, witness intimidation, RICO and VCAR.

In that indictment Defendant was charged in one count - a single drug conspiracy count (hereinafter referred to as James 1).

In the early morning hours of January 4, 2002, a large group of agents of the FBI and other agencies arrived at Defendant James' home to arrest him in connection with the James 1 indictment. They rushed him from his bed and conducted a search, which produced a substance containing a detectable amount of cocaine base. A lab report (Exhibit A) came to the following conclusions with respect to quantity: Net Weight 5.4 grams, Total Net 4.5 grams.

The government maintained that the seized illegal substance was unrelated to the drug conspiracy charged in James 1. The government brought the subject one-count indictment (James 2) charging defendant James with possession of the substance seized when his home was raided.

On October 10, 2002, Defendant James entered a plea of guilty to the single count in James 2. The agreement contained a stipulation that 5.4 grams was involved. With Acceptance of Responsibility, his Adjusted Offense Level should have been 23, calling for a sentencing range of 51-63 months, half the 120 months called for by the mandatory minimum. In the PSR the probation officer extrapolated from certain reports that the quantity he was involved with was greater, calling for an adjusted offense level 26. Given that the 120 months would trump either number, the significant quantity dispute that could have been raised was not.

With the departure sought by Defendant James the court, both the pre- and post-<u>Booker,</u> was free to sentence him below the mandatory minimum 10-year sentence provided by 21 U.S.C. §841(b)(1)(B) and below the Adjusted offense level. Indeed, Mr. James could have been sentenced to probation, rather than incarceration. The court,

however, its fact finding not having produced the requested departure, sentenced defendant James to the mandatory 120 months.

I. **DEFENDANT JAMES IS ENTITLED TO A JURY TRIAL ON THE REQUESTED DEPARTURE.**

In the opening paragraph of the historic <u>Booker</u> opinion, the Untied States Supreme court ruled as follows:

> We hold that both courts correctly concluded that the Sixth Amendment as construed in <u>Blakely</u> does apply to the Sentencing Guidelines. In a separate opinion authored by Justice BREYER, the Court concludes that in light of this holding, two provisions of the Sentencing Reform Act of 1984(SRA) that have the effect of making the Guidelines mandatory must be invalidated in order to allow the statute to operate in a manner consistent with congressional intent.

Id, page 746.

Justice BREYER, in that separate opinion, observed as follows

> The first question that the Government has presented in these cases is the following: "Whether the Sixth Amendment is violated by the imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant." Pet. for Cert. in No. 04-104, p. I. The Court, in an opinion by Justice STEVENS, answers this question in the affirmative. Applying its decisions in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and <u>Blakely v. Washington</u>, 542 U.S. ----, 124 S.Ct. 2531 (2004), to the Federal Sentencing Guidelines, the Court holds that, in the circumstances mentioned, the Sixth Amendment requires juries, not judges, to find facts relevant to sentencing. See *ante,* at 771- 772, 782 (STEVENS, J., opinion of the Court).

Id, page 756.

Finally, Footnote 8 of <u>Crosby</u> reads:

> We note that <u>Booker/Fanfan</u> did not explicitly excise subsection 3553(b)(2), concerning the Guidelines ranges for child crimes and sexual offenses; any parts of section 3553(e), concerning substantial assistance departures below mandatory minimums; or section 3553(f), concerning "safety-valve" relief, each of which state that courts "shall impose" sentences in accordance with Guidelines in certain circumstances. Because none of

–4–

those provisions is implicated in the pending case, we do not consider what effect, if any, Booker/Fanfan has on such provisions.

Defendant James' sentencing range is should have been 51-63 months. In this case, the 10-year sentence is not mandatory unless a factual finding is made that defendant James' efforts do not qualify him for the requested departure. Under the Sixth Amendment to the U.S. Constitution, he is entitled to have a jury make that determination.

    A.    <u>A Government Motion is not required</u>.

The departure sought by Defendant James required that fact-finding take place. The government claimed that Defendant James was entitled to no hearing on departure eligibility, as the language of the requested departure calls for a government motion. Without such a motion, a defendant seeking such a departure, pre-<u>Booker</u>, faced an uphill battle just to get a hearing. The tide ran against such a defendant, as the hearings tended to be proceedings wherein the court would attempt to determine whether certain thresholds had been met even before the court could take evidence on the merits of the claim.

<u>Booker</u> made clear, however, that the guidelines are not mandatory. Defendant James maintains, therefore, that the non-mandatory nature of the guidelines applies to the "motion" requirement. In short, any government motion requirement which may have existed is no longer mandatory. The submission of the relevant fact-finding to the jury should not be impeded by the absence of a government motion.

Defendant James is entitled to a jury trial on the requested departure.

LAW OFFICES OF ROBERT SULLIVAN 190 Main Street Westport, CT 06880 Tel. 227-1404 Juris No. 405837 Federal Bar No. CT08969

II. **DEFENDANT JAMES IS ENTITLED TO A JURY TRIAL AS TO HIS GUILT.**

    A.    <u>Defendant James is entitled to withdraw his guilty plea and proceed to trial</u>.

At the conclusion of his opinion in <u>Booker</u>, Justice BREYER emphasized its landmark nature, observing that

> ... the constitutional jury trial requirement would nonetheless affect every case. It would affect decisions about whether to go to trial. It would affect the content of plea negotiations. It would alter the judge's role in sentencing. Thus we must determine likely intent not by counting proceedings, but by evaluating the consequences of the Court's constitutional requirement in light of the Act's language, its history, and its basic purposes.

Id., page 758.

The facts of this case were such the going to trial, at all, was a very close call. Defendant James was charged with possession of five grams or more of a substance containing a detectable amount of cocaine base. The lab report (attached Exhibit A) reflects that although the gross amount purported to be 5.4 grams, the total net was 4.5 grams. Defendant's decision to plead was a difficult one for a host of reasons including that he was a hardworking father of two toddlers with a lengthy, stable work history, who had been together with his common law wife for upwards of 10 years. He had been abused by an addicted mother. The prior conviction which qualified him for the mandatory minimum 10 years had occurred eight years earlier when he was 18 years old. His employer came to court to petition the court for as lenient a sentence as possible, as strong evidence of his reliable work ethic. The PSR investigation confirmed that work ethic.

As is more fully set forth, below, these circumstances support the court's granting of the opening of the plea.

–6–

B.  <u>Rule 11 provides for the withdrawal of the guilty plea</u>.

Under Rule 11(d)(2)(B) a defendant may withdraw a plea of guilty after the court accepts the plea, but before it imposes sentence if the defendant can show a fair and just reason for requesting the withdrawal. Noted, above, is Justice BREYER's observation in <u>Booker</u> that its landmark ruling would influence, <u>inter alia</u>, a defendants decision to proceed to trial. As also indicated above, defendant James was a hardworking father of two toddlers who, despite an abusive inner-city upbringing, by an addictive mother, had been with one woman, the mother of both of his children, since they were teenagers. He had been out of trouble for eight years. The claim by the government that he was involved with Quinne Powell and his associates was resolved with the dismissal of the single count against him in the James 1 indictment. Most importantly, the quantity seized was borderline in terms of whether it amounted to five grams, or something less.

The case is before this court for a sentencing evaluation. The effect of the remand is that it is as though Defendant James has not yet been sentenced.

In addition, Rule 11(d)(2)(B) provides that following sentencing (should the court deem this request to be post-sentencing), a plea may be set aside on direct appeal or collateral attack. This matter has been returned to this court on direct appeal for further proceedings following landmark Supreme Court and Second Circuit rulings directly addressing a defendant's Sixth Amendment right to a jury.

The court is to take a fresh look at the Defendant's sentence. There are no presumptions of correctness to be indulged. Indeed, at page 752 the <u>Booker</u>, majority observed:

> "[t]he Framers would not have thought it too much to demand that, before depriving a man of [ten] more years of his liberty, the State should suffer

–7–

> the modest inconvenience of submitting its accusation to 'the unanimous suffrage of twelve of his equals and neighbours,' rather than a lone employee of the State." <u>Blakely</u>, 542 U.S., at ----, 124 S.Ct., at 2543 (citations omitted).

At page 756 the <u>Booker</u> majority observed:

> All of the foregoing support our conclusion that our holding in Blakely applies to the Sentencing Guidelines. We recognize, as we did in Jones, Apprendi, and Blakely, that in some cases jury factfinding may impair the most expedient and efficient sentencing of defendants. But the interest in fairness and reliability protected by the right to a jury trial--a common-law right that defendants enjoyed for centuries and that is now enshrined in the Sixth Amendment--has always outweighed the interest in concluding trials swiftly. <u>Blakely</u>, 542 U.S., at ----, 124 S.Ct., at 2542- 43. As Blackstone put it:
>
>> "[H]owever convenient these [new methods of trial] may appear at first (as doubtless all arbitrary powers, well executed, are the most convenient) yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concerns." 4 Commentaries on the Laws of England 343-344 (1769).

The court should permit Defendant James to withdraw his plea and proceed to trial as requested herein.

    C.    <u>The court should declare unconstitutional, as applied, a mandatory minimum which exceeds a Federal Sentencing Guideline Range.</u>

Defendant James' Sentencing Guideline Range should have been 51-63 months. The court, however, imposed the 120-month mandatory minimum provided for by 21 U.S.C. §841(b)(1)(B). Defendant James respectfully submits that, for the reasons set forth below, the court should sentence defendant James within the range provided for by the Sentencing Guidelines, notwithstanding the mandatory minimum.

-8-

The commentary to U.S.S.G § 1A1.1 reads in relevant part as follows:

<u>Application Note</u>:

1. <u>Historical Review of Original Introduction.</u>--Part A of Chapter One originally was an introduction to the Guidelines Manual that explained a number of policy decisions made by the Commission when it promulgated the initial set of guidelines. This introduction was amended occasionally between 1987 and 2003. In 2003, as part of the Commission's implementation of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (the 'PROTECT Act', Pub. L. 108-21), the original introduction was transferred to the Historical Note at the end of this guideline. <u>The Commission encourages the review of this material for context and historical purposes.</u>

<u>Background</u>: The Sentencing Reform Act of 1984 changed the course of federal sentencing. Among other things, the Act created the United States Sentencing Commission as an independent agency in the Judicial Branch, and directed it to develop guidelines and policy statements for sentencing courts to use when sentencing offenders convicted of federal crimes. Moreover, <u>it empowered the Commission with ongoing responsibilities to monitor the guidelines, submit to Congress appropriate modifications of the guidelines and recommended changes in criminal statutes, and establish education and research programs. The mandate rested on Congressional awareness that sentencing was a dynamic field that requires continuing review by an **expert body** to revise sentencing policies, in light of application experience, as new criminal statutes are enacted, and as more is learned about what motivates and controls criminal behavior.</u>

<u>HISTORICAL NOTES</u>

2003 Amendments

Part A formerly read as follows:

        PART A--INTRODUCTION

"1. <u>Authority</u>

    "The United States Sentencing Commission ('Commission') is an independent agency in the judicial branch composed of seven voting and two non-voting, ex officio members. <u>Its principal purpose is to establish sentencing policies and practices for the federal criminal justice system that will assure the ends of justice by promulgating detailed guidelines</u>

–9–

<u>prescribing the appropriate sentences for offenders convicted of federal crimes.</u>

"The guidelines and policy statements promulgated by the Commission are issued pursuant to Section 994(a) of Title 28, United States Code.

"2. <u>The Statutory Mission</u>

"The Sentencing Reform Act of 1984 (title II of the Comprehensive Crime Control Act of 1984) provides for the development of guidelines that will further the basic purposes of criminal punishment: Deterrence, incapacitation, just punishment, and rehabilitation. <u>The Act delegates broad authority to the Commission to review and **rationalize** the federal sentencing process.</u>

"The Act contains detailed instructions as to how this determination should be made, the most important of which directs the Commission to create categories of offense behavior and offender characteristics. An offense behavior category might consist, for example, of 'bank robbery/committed with a gun/$2500 taken.' An offender characteristic category might be 'offender with one prior conviction not resulting in imprisonment.' The Commission is required to prescribe guideline ranges that specify an appropriate sentence for each class of convicted persons determined by coordinating the offense behavior categories with the offender characteristic categories. Where the guidelines call for imprisonment, the range must be narrow: the maximum of the range cannot exceed the minimum by more than the greater of 25 percent or six months. 28 U.S.C. § 994(b)(2).

...

"3. <u>The Basic Approach</u> (Policy Statement)

...

"Honesty is easy to achieve: The abolition of parole makes the sentence imposed by the court the sentence the offender will serve, less approximately fifteen percent for good behavior. There is a tension, however, between the mandate of uniformity and the mandate of proportionality. <u>Simple uniformity-- sentencing every offender to five years--destroys proportionality</u>. Having only a few simple categories of crimes would make the guidelines uniform and easy to administer, but might lump together offenses that are different in important respects. For example, a single category for robbery that included armed and unarmed

-10-

robberies, robberies with and without injuries, robberies of a few dollars and robberies of millions, would be far too broad.

...

"In its initial set of guidelines, the Commission sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice. It analyzed data drawn from 10,000 presentence investigations, the differing elements of various crimes as distinguished in substantive criminal statutes, the United States Parole Commission's guidelines and statistics, and data from other relevant sources in order to determine which distinctions were important in pre-guidelines practice. After consideration, the Commission accepted, modified, or rationalized these distinctions.

...

"The Commission did not simply copy estimates of pre-guidelines practice as revealed by the data, even though establishing offense values on this basis would help eliminate disparity because the data represent averages. Rather, it departed from the data at different points for various important reasons. Congressional statutes, for example, suggested or required departure, as in the case of the Anti-Drug Abuse Act of 1986 that imposed increased and mandatory minimum sentences. In addition, the data revealed inconsistencies in treatment, such as punishing economic crime less severely than other apparently equivalent behavior.

"Despite these policy-oriented departures from pre-guidelines practice, the guidelines represent an approach that begins with, and builds upon, empirical data. The guidelines will not please those who wish the Commission to adopt a single philosophical theory and then work deductively to establish a simple and perfect set of categorizations and distinctions. The guidelines may prove acceptable, however, to those who seek more modest, incremental improvements in the status quo, who believe the best is often the enemy of the good, and who recognize that these guidelines are, as the Act contemplates, but the first step in an evolutionary process. After spending considerable time and resources exploring alternative approaches, the Commission developed these guidelines as a practical effort toward the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system.

Emphasis Added.

Congress established the Commission as its expert body for the purpose of determining, following significant analysis and consideration, the appropriate sentence for Defendant James.  The Guideline sentence takes into account, <u>inter</u> <u>alia</u>, Mr. James' Acceptance of Responsibility, his role in the offense, his history of prior convictions, as well as the type and quantity of drugs involved.  The commission has determined that the appropriate, fair sentence for Defendant James (based on a quantity of 5.4 grams) is the range 51-63 months.

All of the Commission's considerations are abandoned, however, in favor of the almost double, mandatory minimum established by Congress ***without*** the benefit of the considered deliberation of an expert body.

The result is arbitrary and capricious.  It is cruel and unusual to sentence a defendant to almost double the jail time deemed proper by Congress' own expert body. It violates equal protection to deny a Defendant the protections of, <u>inter</u> <u>alia</u>, Acceptance of Responsibility merely because he has been charged with a crime for which Congress authorized a mandatory minimum.  Indeed, when a mandatory minimum applies, there is rarely any point in researching or exploring creative, out of the ordinary departures since they will be overridden by the mandatory minimum (in this case, the not-so creative downward departure for overstatement of criminal history is worthy of consideration). Finally, mandatory minimums vest in the prosecutor a disproportionate amount of power, as the prosecutor is in a position to charge certain individuals with crimes calling for mandatory minimums, and others with related crimes not carrying the same mandatory sentences.

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837 Federal Bar No. CT08969

Defendant James respectfully urges this court to declare unconstitutional the mandatory minium sentence provided for by 21 U.S.C. §841(b)(1)(B), as applied, in violation of, inter alia, the Eighth Amendment prohibition against Cruel and Unusual Punishment, Equal Protection clause of the Fourteenth Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States.

                                      Respectfully submitted,
                                      DEFENDANT RONNIE JAMES

                                      By_____
                                        Robert J. Sullivan, Jr.
                                        LAW OFFICES OF ROBERT SULLIVAN
                                        190 Main Street
                                        Westport, Connecticut 06880
                                        Tel. No. 203/227-1404
                                        Federal Bar No. CT08969

**CERTIFICATION**

      This is to certify that a copy hereof was mailed on September 27, 2005 to the following:

James Filan, AUSA
Office of U.S. Attorney
915 Lafayette Blvd.
Bridgeport, CT 06604

                                                                                   _____
                                                                                    Robert J. Sullivan, Jr.

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837  Federal Bar No. CT08969